Juan LARA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–86–0505–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 15, 1987.

Neil C. McCabe, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Linda A. West, Claire Connors, Harris County Asst. Dist. Attys., Houston, for appellee.

Before WARREN, HOYT and DUNN, JJ.

## OPINION ON REHEARING

DUNN, Justice.

Our prior opinion of June 11, 1987, is withdrawn, and the following is substituted.

A jury found the appellant guilty of murder, found an enhancement paragraph true, and assessed punishment at confinement for life.

The sufficiency of the evidence is not challenged.

In point of error one, the appellant argues that the trial court erred by failing to have the indictment read to the jury, and by failing to have the appellant plead to the charge in front of the jury at the commencement of the guilt-innocence phase. The appellant's argument is based on Tex. Code Crim.P.Ann. art. 36.01 (Vernon 1981) and Tex.R.App.P. 80(d). Article 36.01(1) states:

A jury being impaneled in any criminal action, the cause shall proceed in the following order:

1. The indictment or information shall be read to the jury by the attorney prosecuting.

Tex.R.App.P. 80(d) states:

(d) Presumptions in Criminal Cases

The court of appeals shall presume ... that the defendant was arraigned; that he pleaded to the indictment....

The appellant timely filed and timely presented to the trial court a formal bill of exception. Therein the appellant stated:

As duly recorded in the docket sheet, on the date of trial, June 25, 1986, 'At 10:20 a.m. defendant was arraigned out of the present [sic] of the jury.' The indictment was not read and the defendant did not enter a plea in the presence of the jury before the presentation of the state's case or at any time thereafter during trial. *See Warren v. State,* 693 S.W.2d 414, 416 (Tex.Crim.App.1985) (such error,

when discovered after trial, can be preserved by bill of exception).

The trial judge signed the bill of exception only after adding the statement, "Corrected, with consent of counsel, to incorporate Judge's Response." The judge's response is as follows:

Having returned from trial in Galveston County, the undersigned Judge makes the following response:

### I.

Standard operating procedure in this Court is to arraign the Defendant before the jury.

### II.

In the trial in question, the Court specifically remembers the request of the defense attorney to arraign the defendant outside the presence of the jury. This was done, pursuant to his request.

### III.

*This Court has no independent recollection of whether a second arraignment was held in the presence of the jury.*

### IV.

This Court has a very specific memory of defense counsel, Mr. Elizondo, and his co-counsel, Mr. Charlton, implying to the Court each day of the trial that error had been committed early in the trial and that all the time and effort that we were expending was a waste. No objection to any alleged procedural omission was lodged. The trial, if I remember correctly, took 5 days.

(Emphasis added.)

The State argues that two presumptions are applicable in this case. The first is the presumption of the regularity of the judgment. The judgment in this case states in part:

The indictment was read to the jury and the defendant entered a plea of not guilty thereto.

The State also argues that Tex.R.App.P. 80(d) creates a statutory presumption that the appellant pleaded to the indictment.

■ The State is correct, except that these presumptions can be defeated if the error has been brought to the attention of the trial court, or if there is an affirmative showing to the contrary. *Sharp v. State,* 707 S.W.2d 611, 616 (Tex.Crim.App.1986). In the case before us, because there was no objection at trial, we must decide whether there exists an affirmative showing in the record to overcome these presumptions. *See Warren v. State,* 693 S.W.2d 414, 416 (Tex.Crim.App.1985).

■ A bill of exception is a proper method to show error in the record. *Warren,* 693 S.W.2d at 416. However, this particular bill of exception is inadequate to defeat the presumptions, because the judge's response does not specifically and affirmatively approve the assertion in the appellant's bill of exception that "the defendant did not enter a plea in the presence of the jury before the presentation of the State's case or at any time thereafter during trial."

■ When a formal bill of exception is presented for the trial judge's allowance and signature, the trial judge has two choices. If the trial judge finds the bill to be correct, the judge merely signs the bill with no comments. Tex.R.App.P. 52(c)(5). If the judge corrects the bill, as in this case, this is a finding that the bill is incorrect pursuant to Tex.R.App.P. 52(c)(6). If the party does not agree to these corrections, "the judge shall return the bill to him with his refusal endorsed thereon, and shall prepare, sign, and file with the clerk such bill of exception or will, in his opinion, present the ruling of the court as it actually occurred." Tex.R.App.P. 52(c)(7). If the appellant did not agree with the trial judge's suggested corrections, the appellant should have availed himself of Tex.R. App.P. 52(c)(8), which states as follows:

Should the party be dissatisfied with said bill filed by the judge, he may, upon procuring the signatures of three respectable bystanders, citizens of this State, attesting to the correctness of the bill as presented by him, have the same

filed as part of the record of the cause. . . .

There is no bystanders' bill in the record. Because of the trial judge's corrections to the bill of exception, the appellant has not overcome either the presumption in article 44.24(a), or the presumption of regularity of the judgment.

On motion for rehearing, the appellant cites *Warren Petroleum Corp. v. Pyeatt,* 275 S.W.2d 216 (Tex.Civ.App.—Texarkana 1955, writ ref'd n.r.e.), as authority for the proposition that a bill containing the judge's correction stating that she had no "independent recollection" must be considered as approved without qualification.

The appellant's reliance on *Warren Petroleum* is misplaced because the issue before the Texarkana Court of Appeals was whether the bill of exception preserved error. The court held that the bill of exception was defective because it did not show that error had been preserved by an objection to the argument complained of, and any error was therefore waived. In dicta, the appeals court discussed the trial judge's comments to the bill and stated that "a conditional qualification of a bill will not be considered. The qualification must be plain and positive; otherwise, the bill will be considered as approved without qualification." *Warren Petroleum,* 275 S.W.2d at 219–20. As authority for this statement, the court of appeals cites *Graham v. State,* 72 Tex.Cr.R. 9, 160 S.W. 714 (1913); *Jolley v. Brown,* 191 S.W. 177 (Tex. Civ.App.—Amarillo 1916, no writ); *Walton v. Walton,* 191 S.W. 188 (Tex.Civ.App.— Galveston 1916, no writ); *Irwin v. State Nat'l Bank of Ft. Worth,* 224 S.W. 246 (Tex.Civ.App.—Fort Worth 1920, no writ); *Southland Life Ins. Co. v. Norwood,* 76 S.W.2d 166 (Tex.Civ.App.—Fort Worth 1934, writ dism'd); and *Texas Employers Ins. Association v. McNorton,* 92 S.W.2d 562 (Tex.Civ.App.—Dallas 1936, writ dism'd), 132 Tex. 168, 122 S.W.2d 1043 (Comm'n App.1939, opinion adopted).

In *Graham,* the court qualified the bills of exception with statements that were "independent" of the facts set out in the bill, and also were not supported in the record.

Therefore, the Court of Criminal Appeals considered the bills of exception as though they were not qualified. *Graham,* 160 S.W. at 715.

In *Jolley,* the appeals court held that the qualifications of the trial court were "simply a statement to this Court why the ruling of the trial judge was not reversible." *Jolley,* 191 S.W. at 179. The appeals court stated that the qualification "neither denies, modifies, nor in any way explains the facts set out in the bill." *Id.* The appeals court, therefore, considered the bill as though it was not corrected by the trial court.

In *Walton,* the appellant filed a bill of exception to preserve the testimony of a witness that was excluded when the court sustained an objection asserting that the witness was incompetent. 191 S.W. at 188. The trial court qualified the bill by stating that he had not been told the substance of the witness' testimony at the time of the ruling. *Walton,* 191 S.W. at 189–190. The court of appeals held that this qualification was irrelevant to the bill itself, and therefore, it considered the bill as though there were not corrections. *Walton,* 191 S.W. at 190.

The appellant's reliance on *Irwin* is also misplaced because the trial judge in *Irwin* "allowed" the bill of exception stating that

the court has no recollection at this time of having been requested to file same [findings of fact and conclusions of law], but from the statement of the attorney representing the defendant, J.E. Black, that he made such request, the *court presumes that he did so.*

*Irwin,* 224 S.W. at 247 (emphasis added). The trial judge in *Irwin* affirmatively approved the bill based upon his confidence and trust in counsel. In the case before us, the trial judge never specifically and affirmatively agreed that the indictment was not read and that the appellant did not enter a plea in the presence of the jury.

In *Southland,* the trial judge approved a bill of exception, "but wrote thereon his certificate that he had no individual recollection that counsel was to prepare later a statement of what the answer to the ques-

tion objected to would be, but got his information thereon from 'the record.' " 76 S.W.2d at 168. This bill was apparently requested during trial, but allowed to be completed after trial. The judge's statement merely indicates the source of his knowledge that he had agreed to allow the bill to be made after trial. The appeals court observed that "the practice of allowing bills of exception to be so completed later is salutory where court and counsel have confidence in each other." *Southland*, 76 S.W.2d at 168. The trial judge's qualification neither modified nor changed the assertions in the bill of exception.

In *McNorton*, the appellant filed a bill of exception complaining of certain allegedly prejudicial passages in the argument of counsel. 92 S.W.2d at 570. The trial judge affirmatively stated that the argument was made. *Id.* He did not affirmatively and specifically find that there was no evidence to support the argument. *Id.* Because of this, the bill presented no reversible error and was defective. *Id.*

None of the cases cited in *Warren Petroleum* support the proposition that a conditional qualification of a bill will not be considered. In the case before us, the trial judge's corrections attached to the bill of exception indicate that she did not affirmatively and specifically approve the bill of exception as written, leaving the appellant to proceed as set out in rule 52(c). Therefore, this bill of exception is inadequate to preserve error.

■ Moreover, even if we were to find that the indictment was not read and that the appellant did not enter a plea in the presence of the jury, we would then be compelled to apply a harmless error analysis as required by Tex.R.App.P. 81(b)(2), which states as follows:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

We recognize that the Court of Criminal Appeals has not applied a harmless error analysis in cases deciding this question. *See Warren v. State*, 693 S.W.2d 414 (Tex. Crim.App.1985); *Peltier v. State*, 626 S.W. 2d 30 (Tex.Crim.App.1981). However, these cases preceded the implementation of the new Texas Rules of Appellate Procedure, which now require a harmless error analysis.

Analyzing this error in light of Tex.R. App.P. 81(b)(2), we note that the purpose of an indictment is to "inform the appellant of the charge laid against him," and "one of the purposes of the requirement that it shall be read to the jury at the beginning of the prosecution is to inform them in precise terms of the particular charge laid against the defendant on trial." *Essaray v. State*, 53 Tex.Cr.R. 596, 599, 111 S.W. 927, 930 (1908).

With respect to the first purpose, the record reflects that the appellant was arraigned outside the presence of the jury. The transcript contains a document entitled "Arraignment and Waiver of Speedy Trial," dated October 8, 1985, which states that the "undersigned Defendant appeared in person, and by his Counsel, and having been duly arraigned/or having waived formal arraignment, enters plea of not guilty." The appellant and his attorney signed this document. The statement of facts indicates that a pre-trial motion hearing was held on June 25, 1985, outside of the presence of the jury, and that the indictment was read to the appellant, and that he entered a plea of not guilty.

With respect to the second purpose, that of informing the jurors of the precise terms of the particular charge against the appellant, the record indicates that the jurors were informed by both the court and the prosecutor of the charges against the appellant. The indictment in this case states as follows:

> (The appellant did) intentionally and knowingly cause the death of JOSE MARTINEZ, hereafter styled the Complainant, by shooting the complainant with a firearm.

It is further presented that in Harris County, Texas, JUAN LARA, hereafter styled the Defendant, heretofore on or about May 28, 1985, did then and there unlawfully intend to cause serious bodily injury to JOSE MARTINEZ, hereafter styled the Complainant, and did cause the death of the Complainant by intentionally and knowingly committing an act clearly dangerous to human life, namely, by shooting the complainant with a firearm.

The statement of facts reveals that during the voir dire of the jury panel on June 24, 1986, the court introduced the appellant to the panel, and told them that he had "been charged by indictment with the offense of murder, alleged to have occurred on or about the 28th day of May, 1985, wherein it is alleged that he caused the death of Jose Martinez." Also during the voir dire of the panel, the assistant district attorney stated as follows:

> I have to prove certain facts to you. I have to prove this defendant—and the defendant is a person charged with a crime—Juan Lara, on May 28th, 1985, here in Harris County, Texas, murdered a man with a gun. I have to prove he did this unlawfully, and he intended to cause serious bodily injury to Jose Martinez. He's the boy that's dead in this case. And he did cause the death of Jose Martinez by intentionally or knowingly committing an act that was clearly dangerous to human life by shooting Jose Martinez with a gun.

Because these statements by the court and the prosecutor informed the jurors of the precise terms of the charge against the appellant, and because the appellant was informed of the charge against him, we find, beyond a reasonable doubt, that the error made no contribution to the appellant's conviction or punishment.

Point of error one is overruled.

In points of error two, three, five, and six, the appellant argues that his right to counsel under the fifth and sixth amendments to the United States Constitution were violated.

The appellant was indicted on June 21, 1985, for the murder of the complainant, Jose Martinez. On September 25, 1985, at approximately 10:30 a.m., Officer Ybarra arrested the appellant pursuant to an arrest warrant.

Both the appellant and his 15–year–old, runaway girlfriend, Yolanda Balderas, were arrested and given *Miranda*[1] warnings by Ybarra. Ybarra asked the appellant if he understood his rights, and the appellant said that he did. The appellant and Balderas were then transported to the Houston Police Department's Homicide Division by Officers Hall and Daniels. The appellant and Balderas waited in the homicide division until Ybarra arrived at approximately noon. Ybarra then gave the appellant *Miranda* warnings again in both Spanish and English, asked him if he had any questions, and inquired whether he understood the warnings. At this point, Ybarra testified that the appellant stated that he "would let us know what happened on that particular day." Ybarra told the appellant not to say anything, "that ... just to ... to stop there and not say anything," because he wanted to take the appellant before a magistrate. The appellant did not say anything more at that point.

Between 1:00 and 1:30 p.m., Ybarra took the appellant from the homicide division to a municipal court judge, and presented the judge with the "formal charges" that had been filed against the appellant. There was no attorney present at this time. The judge gave the appellant the warnings required under Tex.Code Crim.P.Ann. art. 15.17 (Vernon 1986), in both Spanish and English, and asked the appellant if he had any questions. The appellant did not answer. At the suppression hearing, the municipal court judge was uncertain whether he realized that the appellant had already been indicted at the time that he warned the appellant.

Ybarra took the appellant back to the homicide division and placed him in the Chicano squad office. Initially, Balderas was in that office with the appellant for

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

about 30 minutes to one hour, but she was later placed in an interrogation room, which was located five or six feet away from Ybarra and the appellant. Five or ten minutes after the appellant returned from appearing before the judge, the appellant said he wanted to make a written statement. Ybarra again went over the *Miranda* warnings with the appellant, and asked him if he understood each one. The appellant began making his statement in Spanish, and Ybarra typed the statement, translating it, sentence by sentence, into English. Ybarra read the entire confession, page by page, to the appellant in Spanish and English, and the appellant stated that it was correct. Ybarra instructed the appellant to initial each warning if he understood it, and he did. The appellant then told Ybarra that he was giving this statement because "he wanted the truth about what happened, because h[e] didn't want his girlfriend, Yolonda Balderas, involved." The statement was completed and signed by 5:41 p.m.

The United States Supreme Court has formulated two separate tests to determine when the protections of the fifth and sixth amendments come into play. The reason for treating the right to counsel differently under the fifth and sixth amendments is that the "policies underlying the two constitutional protections are quite distinct." *Rhode Island v. Innis*, 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980).

The issue, when analyzing an accused's claim that his fifth amendment rights were violated, is whether the statement resulted from "interrogation." The Supreme Court in *Innis* defined "interrogation" as follows:

[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any *words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.* The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that

the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, *without regard to objective proof of the underlying intent of the police.* A practice that the police *should know* is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers *that they should have known were reasonably likely to elicit an incriminating response.*

*Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1689–90 (footnotes omitted) (emphasis added). The Texas Court of Criminal Appeals has expressly adopted the *Innis* definition of interrogation for fifth amendment purposes. *Paez v. State*, 681 S.W.2d 34, 38 (Tex.Crim.App.1984); *McCrory v. State*, 643 S.W.2d 725, 734 (Tex.Crim.App.1982).

This test requires us to analyze whether the officers *should have known* that their words and actions were reasonably likely to elicit an incriminating response from the appellant. Further, the officers' words and actions can not be construed as interrogation if they are normally attendant to arrest and custody. The record reveals that the appellant's statements were not made in response to any questioning or statements by Ybarra or any other officer.

The question, therefore, is whether Ybarra's or other officers' actions were the "functional equivalent" of questioning. *Innis*, 446 U.S. at 302, 100 S.Ct. at 1690. First, focusing on the subjective perceptions of the appellant, as required by *Innis*, the appellant saw his girlfriend, who was a minor and was dependent upon him, being held in police custody in his presence. The appellant's stated reason for confessing was that he did not want Balderas involved. However, the *Innis* test also requires that the officers' actions were not normally attendant to arrest and custody, and that the officers should have known

that their actions were likely to elicit an incriminating response. This prong of the *Innis* test is not satisfied in the case before us. The record reveals that upon arresting the appellant, the police were presented with the problem of what should be done with Balderas. The police decided to take Balderas to the homicide division to wait until the juvenile authorities could come and pick her up. When Ybarra and the appellant returned from the municipal court building, Ybarra moved Balderas from the homicide division to an interrogation room. Therefore, while the appellant was giving his statement, Balderas was not present.

Given the facts in this case, the officers' temporary placement of Balderas in the homicide division with the appellant was an action normally attendant to the appellant's arrest and custody. Further, there is nothing in the record to suggest that the officers should have known of the appellant's sensitivity to Balderas' presence. *Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1690–91.

■ We find that there was no "interrogation" of the appellant, and therefore, his fifth amendment rights did not come into play.

■ The appellant argues in his motion for rehearing that "even if no interrogation or elicitation occurred, the officer was obliged to terminate the interview at the moment when the appellant invoked his right to counsel." This argument is based on an inquiry made by the appellant when Ybarro was giving the appellant his *Miranda* warnings after the appellant had been taken before the magistrate. When Ybarro told the appellant, "you are entitled to have an attorney, and if you can't afford one, one will be appointed to you," the appellant responded, "Well, I can't afford an attorney." Ybarro then told the appellant again that if he could not afford an attorney, one would be appointed for him. Ybarro also told the appellant that he could have an attorney at that time if he so desired. The question presented is whether the appellant's statement that he could not afford an attorney constituted an invocation of his right to counsel.

The Texas Court of Criminal Appeals recently addressed the issue of an ambiguous or equivocal reference to counsel in *Collins v. State*, 727 S.W.2d 565 (Tex.Crim. App.1987). In *Collins*, the appellant was arrested in Garland, Texas, as a suspect in a robbery there. Police in Houston were notified that the appellant had been arrested, because he was also a suspect in a robbery that had occurred in Houston. Two Houston detectives traveled to Garland and questioned the appellant about the Houston robbery. The police advised the appellant of his *Miranda* rights. Sometime during the interview, before the appellant gave his written statement, the appellant asked if he would get an appointed lawyer when he went to Houston. The detectives told him that if he did not have a lawyer when he got to Houston, one would be appointed for him. The appellant was then brought before a magistrate and informed of his rights. He did not request a lawyer. The appellant was then read the rights included on the statement form, initialed each statement to indicate that he understood them, and then gave a written statement to the detectives. In holding that the appellant had not invoked his right to counsel, the Court of Criminal Appeals stated that it is the "totality of the circumstances surrounding the interrogation and alleged invocation which determines whether or not an accused has invoked his right to counsel." *Collins*, 727 S.W.2d at 568.

Applying this test to the case before us, the record reveals that the appellant's statement that he could not afford counsel was at most an indication that he was confused, at that time, concerning his rights. However, any confusion on the part of the appellant was corrected by Ybarro's subsequent explanation that the appellant could have counsel furnished for him at that time if he so desired. Further, appellant specifically asked to give a written confession, and before signing the confession, the appellant was again given his *Miranda* warnings, and indicated that he understood them by initialing the warnings located at the top of the confession. At no time did the appellant expressly request

the presence of counsel. His expressed reason for giving the statement was that "he wanted the truth about what happened because h[e] didn't want his girlfriend, Yolanda Balderas involved." The totality of the circumstances indicates that the appellant's statement that he could not afford counsel was not an invocation of his right to counsel. *Id.*

Points of error two and three are overruled.

With respect to the alleged violations of the appellant's sixth amendment right to counsel, which attached at the time of indictment,[2] the relevant inquiry is whether the appellant's statement was "deliberately elicited." The Supreme Court first applied the "deliberate elicitation" test to alleged violations of the sixth amendment in *Massiah v. U.S.*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). The *Massiah* court held

> that the petitioner was denied the basic protections of that guarantee (the sixth amendment) when there was used against him at his trial evidence of his own incriminating words, which federal agents had *deliberately elicited* from him after he had been indicted and in the absence of his counsel.

*Id.* (emphasis added).

The *Massiah* court held that the sixth amendment applies to "indirect and surreptitious interrogation as well as those conducted in the jailhouse." *Id.* at 206, 84 S.Ct. at 1203. In *United States v. Henry*, the Court defined "deliberate elicitation" as "intentionally creating a situation likely to induce (a person) to make incriminating statements without the assistance of counsel." 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980). The Supreme Court recently clarified this definition in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In *Moulton*, the Court rejected the State's argument that the sixth amendment was violated only when the police intentionally "set up the confrontation between the accused and a police agent at which incriminating state-

ments were elicited." *Id.* 106 S.Ct. at 486. The Court held that

> the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. See *Henry*, 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring). However, *knowing exploitation by the State* of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by *knowingly circumventing the accused's right* to have counsel present in a confrontation between the accused and a state agent.[12]
>
> 12. Direct proof of the State's knowledge will seldom be available to the accused. However, as *Henry* makes clear, *proof that the State "must have known" that its agent was likely to obtain incriminating statements* from the accused in the absence of counsel suffices to establish a Sixth Amendment violation. See *Henry*, 447 U.S., at 271, 100 S.Ct., at 2187.

*Id.* at 487 (emphasis added).

The Supreme Court's most recent examination of the "deliberate elicitation" test is found in *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). The *Kuhlmann* court stated that "the Court in *Massiah* adopted the reasoning of the concurring opinions in *Spano* [*v. People*, 360 U.S. 315, 79 S.Ct. 202, 3 L.Ed.2d 1265 (1959) ]," and "made clear that it was concerned with interrogation or investigative techniques that were equivalent to interrogation...." *Kuhlmann*, 106 S.Ct. at 2629. The Court stated that "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*, 106 S.Ct. at 2630.

**2.** *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32    L.Ed.2d 411 (1972).

In our review of the Supreme Court's sixth amendment cases from *Massiah* to *Kuhlmann*, the "deliberate elicitation" test has been consistently applied to analyze alleged sixth amendment violations. It is apparent that the Supreme Court in these cases has attempted to insure that interrogation was defined broadly enough to protect the accused's sixth amendment right, *yet* at the same time, narrowly enough to allow the State to use the accused's voluntary, spontaneous statements.

■ In defining the "deliberate elicitation" test, the Supreme Court has emphasized the requirement that the police "knowingly circumvented" the accused's rights. However, in *Henry*, the Supreme Court confronted a situation where the officer unequivocally stated that he did not intend for the government's paid informant, who engaged Henry in conversation while in jail, to take affirmative steps to secure incriminating information from Henry. The majority stated that even if the officer's denial were accepted, "he *must have known* that such propinquity likely would lead to that result." *Henry*, 447 U.S. at 271, 100 S.Ct. at 2187 (emphasis added). Justice Blackmun, joined by Justice White, dissented, because in their view,

> *Massiah* mandates exclusion only if a federal agent 'deliberately elicited' statements from the accused in the absence of counsel. The word 'deliberately' denotes intent. *Massiah* ties this intent to the act of elicitation, that is, to conduct that draws forth a response. Thus *Massiah*, by its own terms, covers only action undertaken with the *specific intent* to evoke an inculpatory disclosure.

*Henry*, 447 U.S. at 278, 100 S.Ct. at 2191 (citation omitted) (emphasis added).

However, Justice Blackmun joined the majority in *Moulton*, a case that reaffirmed *Henry's* holding that the sixth amendment is violated if the State "must have known" that its agent was likely to obtain incriminating statements from the accused in the absence of counsel. *Moulton*, 106 S.Ct. at 487 n. 12. Therefore, the "deliberate elicitation" test is satisfied either with proof of the officer's subjective intent (e.g. the officer admits his intent was to elicit the incriminating statement), or by other evidence that demonstrates that the officer "must have known" that his words or actions were likely to elicit an incriminating response from the accused.

■ Because no sixth amendment constitutional protection "comes into play" unless the accused's statements were "deliberately elicited," we will analyze the facts before us in light of this test. *Brewer v. Williams*, 430 U.S. 387, 400, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). The appellant's sixth amendment rights would be violated if the officers interrogated the appellant, created a situation that they knew or must have known was likely to elicit an incriminating response from the appellant, or if the officers intentionally exploited an opportunity otherwise legitimately created. Under the facts in this case, we have found that the officer did not interrogate the appellant. Further, the evidence presented at the suppression hearing does not support either of the latter two propositions.

The testimony reveals that Balderas was placed in the homicide division for the purpose of waiting for the juvenile authorities to arrive and pick her up. There is no evidence that the officers knew or must have known that by placing Balderas in the homicide division, they were likely to elicit an incriminating statement from the appellant. The second question is whether, having placed Balderas in the homicide division for legitimate purposes, Ybarra then knowingly exploited this opportunity to confront the appellant without counsel being present. The record reveals that Ybarra removed Balderas from the room before the appellant gave his statement. Not only did Ybarra not knowingly exploit Balderas' presence to elicit the confession from the appellant, he took affirmative steps to avoid doing so.

We find that the confession was not "deliberately elicited" from the appellant within the meaning of the sixth amendment. The sixth amendment protection, therefore, did not come into play.

■ The appellant argues in his motion for rehearing that "the action of Officer Ybarro in requesting that the appellant *sign the confession* violated his right to counsel under the sixth amendment." As authority for this argument, the appellant cites *Nehman v. State,* 721 S.W.2d 319 (Tex.Crim.App.1986). In *Nehman,* the appellant indicated that he wished to give a written statement, but as it was being typed and before the appellant signed it, the scheduled time for the appellant's article 15.17 hearing arrived. At the hearing, the justice of the peace informed the appellant of his *Miranda* rights, and *upon the appellant's request,* appointed an attorney to represent the appellant. After the hearing, the appellant testified that he returned to the police department and *told the officers that he wanted to speak to his attorney* before signing the statement.

The court in *Nehman* determined that the appellant's sixth amendment right to counsel had attached; therefore, the issue was whether the appellant had waived this right. 721 S.W.2d at 322. The court held that the State had not met its burden of showing that a valid waiver was obtained, and remanded the case for a new trial. *Nehman,* 721 S.W.2d at 323.

In the case before us, we hold that because Ybarro did not "deliberately elicit" the appellant's confession, the appellant's sixth amendment right to counsel did not "come into play" even though this right had "attached" when the appellant was indicted. We recognize, however, that the court in *Nehman* stated that the "signing of the confession, therefore, represents a critical stage at which the defendant is entitled to representation by an attorney...." 721 S.W.2d at 323 n. 2. We do not believe that the Court of Criminal Appeals meant that the giving and signing of a confession is *always* a critical stage that brings the sixth amendment into play. We construe *Nehman* as limited to its facts.

■ Moreover, even if we were to find that Ybarro's request of the appellant to sign the confession constitutes "deliberate elicitation" or is a "critical stage," we would then face the issue of whether the appellant waived his sixth amendment right to counsel.

'[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights ... A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

*Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (footnote omitted). The United States Supreme Court recently addressed the issue of a defendant's waiver of his sixth amendment right to counsel, and stated that "we construe the defendant's request for counsel as an *extremely important fact* in considering the validity of a subsequent waiver in response to police-initiated interrogation." *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1409 n. 6, 89 L.Ed.2d 631 (1986) (emphasis added).

In the case before us, the appellant never expressly requested the presence of counsel, even though he was told on at least three occasions by Ybarro and once by the municipal judge that he had the right to have counsel appointed for him. The appellant's native language is Spanish, and the *Miranda* warnings were given to him in both Spanish and English. During the time the appellant was giving his written confession, he specifically told Ybarro that he wanted to tell "the truth about what happened, because h[e] didn't want his girlfriend, Yolanda Balderas, involved." The appellant initialed the warning that stated, "I have the right to have a lawyer present to advise me prior to and during any questioning. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning...." The form stated that "I knowingly, intelligently and voluntarily waive the rights set out above...." Further, within five or ten minutes after returning from being advised of his rights

by the magistrate, the appellant voluntarily requested that he be allowed to give a *written statement* without any comment or provocation on the part of the officer. The officer's request of the appellant to sign the confession could not, under these facts, be considered anything other than a procedural aspect of the appellant's desire to give a written confession. Even if we were to find that Ybarro's request of the appellant to sign the confession constitutes "deliberate elicitation" or is a "critical stage," we would then find that, given the circumstances in this case, the appellant waived his sixth amendment right to counsel.

The appellant invites us to adopt the minority view that holds that a defendant may not waive his sixth amendment right to counsel unless he does so in the presence of counsel. *See People v. Skinner*, 52 N.Y.2d 24, 436 N.Y.S.2d 207, 417 N.E.2d 501 (1980); *People v. Settles*, 46 N.Y.2d 154, 412 N.Y.S.2d 874, 385 N.E.2d 612 (1978). The decisions in these cases are rooted in the New York constitution. *Skinner*, 436 N.Y.S.2d at 209, 417 N.E.2d at 503; *Settles*, 412 N.Y.S.2d at 877, 385 N.E.2d at 615. We decline to adopt this rule in Texas.

Points of error five and six are overruled.

In points of error four and seven, the appellant argues that his rights under Tex. Const. art. I, sec. 10, and Tex.Code Crim.P. Ann. arts. 38.22, 38.23 (Vernon 1979) were violated. This argument is without merit.

■ The relevant portion of art. I, sec. 10 states as follows:

He shall not be compelled to give evidence against himself, and shall have the right of being heard by himself or counsel, or both....

The phrase in Tex. Const. art. I, sec. 10 "to give evidence against himself" is no more encompassing than the phrase, "witness against himself" used in the fifth amendment to the United States Constitution. The two provisions have a "common ancestry," and are "comparable in scope." *Olson v. State*, 484 S.W.2d 756, 761–62 (Tex.Crim.App.1969) (op. on reh'g); *see*

*also McKenna v. State*, 671 S.W.2d 138, 139 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd). With respect to the sixth amendment, the Texas Court of Criminal Appeals recently held that the standard formulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for evaluating an attorney's performance pursuant to the sixth amendment will be applied to ineffective assistance of counsel claims under art. 1, sec. 10. *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim. App.1986). The Court of Criminal Appeals stated that the

language of Art. I, Sec. 10, insuring that a defendant 'shall have the right of being heard by himself or counsel, or both,' can be traced back to the 1836 Constitution of the Republic of Texas and was *obviously modeled on the Sixth Amendment* to the federal constitution which guarantees the accused's right, 'to have the Assistance of Counsel for his defense.'

*Id.* at 56 (footnote omitted) (emphasis added).

■ Given the similarity between art. I, sec. 10 and the fifth and sixth amendments, we find no policy reason for departing from the United States Supreme Court's analysis of when these constitutional protections are triggered. Accordingly, we hold that when an accused claims that his art. I, sec. 10 right against self-incrimination has been violated, the fifth amendment "interrogation" test shall be applied to determine if this portion of art. I, sec. 10 comes into play. Similarly, when an accused alleges that his art. I, sec. 10 right to counsel has been violated, the sixth amendment "deliberate elicitation" test shall be applied to determine if this portion of art. I, sec. 10 comes into play.

Having already applied these tests to the facts before us, we find that the appellant's rights under art. I, sec. 10 did not come into play.

■ The appellant also alleges that his rights under Tex.Code Crim.P.Ann. arts. 38.22 and 38.23 were violated. By its express terms, article 38.22 only applies to a

"written statement made by an accused as a result of custodial interrogation." Having already held that the appellant was not interrogated, this article is not applicable in the case before us. Article 38.23 is equally inapplicable in that we have held that the appellant's statement was not obtained in violation of the "Constitution or laws of the State of Texas, or the Constitution or laws of the United States of America." Tex. Code Crim.P.Ann. art. 38.23.

Points of error four and seven are overruled.

■■■ In point of error eight, the appellant argues that "the trial court erred in admitting evidence of an extraneous killing that took place after the one being tried and that did not relate to a contested material issue." This argument is without merit.

The record indicates that the complainant, Jose Martinez, lived with Esther Rodriguez in an apartment in the same complex as the appellant's. The appellant and a companion planned to rob Martinez and Rodriguez of their money and cocaine. The appellant went to the couple's apartment, knocked on the door, and told Martinez that he had a friend that wanted to buy one-eighth of an ounce of cocaine. Martinez told Rodriguez about the deal, and she said she would accompany him. The appellant left to talk with his companion, and they decided that it would not be a good idea to rob the couple together. The appellant and companion returned to the apartment, and told the couple that the deal had fallen through. At this point, all four of them were standing at the bottom of the stairs leading to the couple's apartment. Rodriguez returned to their apartment. The appellant's companion asked Martinez to accompany him to see a non-existent marijuana plant in the apartment's courtyard. While Martinez was bending over to look for the marijuana plant, the appellant shot him in the back of the head. The appellant and his companion become scared at this point and fled to another location. The companion told the appellant that if they wanted the money and the cocaine, they would have to return to the

apartment and kill Rodriguez. The companion also told the appellant that if the appellant did not kill Rodriguez, she would tell the police that they had been seen with him. The appellant returned to the apartment and killed Rodriguez. The appellant then left the apartment, and told his companion to take the money and cocaine from the apartment, which he did.

The appellant's killing of Rodriguez was relevant to a material issue in this case, specifically, to prove that the appellant's motive in the killing was to steal money and cocaine. The Texas Court of Criminal Appeals has stated that

> evidence of the context of the offense is almost always admissible under the reasoning that events do not occur in a vacuum and the jury has a right to have the offense placed in its proper setting so that all evidence may be realistically evaluated.

*Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim.App.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987).

The test for admissibility of an extraneous offense is that the offense is relevant to a material issue in the case, and that the relevancy value of the evidence outweighs its prejudicial or inflammatory effect. The Court of Criminal Appeals recently held this test need not be applied in a case like the one before us, because "it has long been the rule in this State that the jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense...." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex.Crim.App.1986). The extraneous offense was properly admitted.

Point of error eight is overruled.

In point of error nine, the appellant argues that Balderas is his common-law wife, and therefore, the trial court erred by allowing her to testify against him in violation of Code of Criminal Procedure, ch. 722, 1965 Tex.Gen.Laws 317, *amended by* ch. 399, sec. 2(A), 1973 Tex.Gen.Laws 883, 972, *repealed by* Rules of Procedure and Evidence in Criminal Cases—Promulgation by Court of Criminal Appeals, ch. 685, sec. 9(b), 1985 Tex.Gen.Laws 2472, 2474. This argument is without merit.

■ In order for the marital privilege to apply, the parties must be married to each other at the time of trial. *Bear v. State,* 612 S.W.2d 931, 932 (Tex.Crim.App. 1981). To prove the existence of a common-law marriage, the following elements must be established:

1) an agreement by the parties to become husband and wife;

2) a living together pursuant to such agreement; and

3) a holding out of each other to the public as husband and wife.

*Phillips v. State,* 701 S.W.2d 875, 893 (Tex. Crim.App.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1987). A hearing on this issue was held outside of the jury's presence. The trial judge found that Balderas was not the appellant's common-law wife. We will not disturb this finding absent an abuse of discretion.

■ Balderas testified to the following at the hearing: that she and the appellant never agreed to be married, that she never signed her name as Mrs. Lara, that she never told anyone that she was married to the appellant, and that they were not living together as husband and wife. Based upon this evidence, the trial judge did not abuse his discretion in overruling appellant's assertion of the husband-wife privilege.

Point of error nine is overruled.

■ In point of error 10, the appellant argues that the "trial court erred in refusing to submit to the jury the issue whether, by her participation in the conspiracy to rob the deceased, Balderas was an accomplice to the killing as a matter of fact."

The trial judge instructed the jury, regarding whether Balderas was an accomplice as a matter of fact, as follows:

An accomplice, as the term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before or during the commission of the offense, and whether or not they were present and participated in the commission of the

crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Mere presence alone, however, will not constitute one a party to an offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. The term 'conduct' means any act or omission and its accompanying mental state.

You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the jury first believe[s] that the accomplice's testimony is true and that it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

Now if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Yolanda Balderas was an accomplice, or you have a reasonable doubt whether she was or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of the said Yolanda Balderas unless you first believe that the said Yolanda Balderas' testimony is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant unless you further believe that there is other evidence in the case, outside of the evidence of the said Yolanda Balderas[,] tending to connect the defendant with the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The appellant asked the trial court to also charge the jury that Balderas was an accomplice as a matter of fact, under Tex. Penal Code Ann. secs. 7.02(b), 15.02 (Vernon 1974) as follows:

We ask that the Court include within an instruction on the accomplice charge; that the court include within the instruction on accomplice testimony, the following paragraph: 'If in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of a felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.'

\* \* \* \* \* \*

Request therefore if you find that the offense of murder was one that should have been foreseen as a result of the conspiracy, robbing the individuals, and you find that the witness, Yolanda Balderas, was an accomplice to that conspiracy or to that robbery, then you will find the witness an accomplice to the offense of murder as well; a charge to that effect.

The appellant's complaint on appeal is that the trial court instructed the jury only on the issue of being an accomplice to murder, without addressing the issue of her participation in the conspiracy to rob the deceased. The appellant argues that the facts adduced at trial gave rise to the inference that Balderas was a party to the conspiracy to rob the deceased, and that the murder was in furtherance of the conspiracy and should have been anticipated. Tex.Penal Code Ann. sec. 7.02(b).

Assuming, without deciding, that the appellant's argument is valid, the question is whether the appellant was harmed. *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim. App.1985). In the case before us, the jury charge was objected to; therefore, "reversal is required if the error is 'calculated to injure the rights of the defendant,' which means no more than that there must be *some* harm to the accused from the error."

*Id.* at 171. If the requested instruction had been given to the jury, and if the jury had found that Balderas was a conspirator to the murder via her conspiracy to the robbery, the result would have been that the jury could not have convicted the appellant unless it found evidence, other than that offered by Balderas, connecting the appellant with the murder. The evidence in this case connecting the appellant with the murder includes not only his voluntary, written confession, but the testimony of Ruth Corona. Corona testified that she and her family lived at the same apartment complex as the appellant, and that she recalled the night that Martinez and Rodriguez were murdered. Approximately two months after the murders, Corona saw the appellant and asked him what had happened that evening. The appellant admitted to her that he had killed Martinez and Rodriguez for their money. Corona also testified that when the appellant said this that he was smiling and talking normally.

Even if the trial court erred in not instructing the jury as requested by the appellant, we find, beyond a reasonable doubt, that no harm has been shown because the error, if any, made no contribution to the appellant's conviction or to the punishment. Tex.R.App.P. 81(b)(2).

Point of error 10 is overruled.

The judgment of the trial court is affirmed.